**E-FILED**
Monday, 02 February, 2009  04:34:28 PM
Clerk, U.S. District Court, ILCD

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS, SPRINGFIELD DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 07-CR-30022 |
| | ) | |
| ARTURO RAMIREZ, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

BYRON G. CUDMORE, U.S. MAGISTRATE JUDGE:

This cause comes before the Court on Defendant's Omnibus Pretrial Motions (d/e 59) (Motion).  In his Motion, Defendant has moved to suppress evidence seized after a traffic stop and all statements taken from him during and after the traffic stop.  Defendant also has moved to dismiss the Indictment (d/e 7).  The Motion is fully briefed, and pursuant to 28 U.S.C. § 636(b)(1)(B), the District Judge has referred the matter to this Judge for an evidentiary hearing and Report and Recommendation.  See Text Order for November 18, 2008.  After carefully considering all of the submissions of the parties and hearing evidence on the matter, I recommend that the Motion be denied.

## I.  BACKGROUND[1]

Defendant Arturo Ramirez is charged in a one-count Indictment with knowingly and intentionally possessing 5 kilograms or more of a mixture or substance containing cocaine and 100 kilograms or more of a mixture or substance containing marijuana.  The matter came before this Court for evidentiary hearing on the instant Motion on January 28, 2009.  Based on the testimony heard in open court, Defendant  was arrested on February 12, 2007 after a traffic stop at which police discovered approximately 1,260 pounds of marijuana and 19 kilograms of cocaine in the trailer of the truck he was driving.  Defendant seeks to suppress the evidence seized from the truck and statements he made to the police during and after the traffic stop. He also asks the Court to dismiss the Indictment based on allegations that police targeted him for the traffic stop because he is Mexican / Hispanic and that they later tampered with and fabricated evidence from the stop and lied to the Court.

The Government called five witnesses: Illinois State Police (ISP) Trooper Nathan Miller, ISP Canine Officer Anthony Maro, ISP Task Force Officer Timothy Hansen, Drug Enforcement Administration (DEA)

---

[1] This Report and Recommendation is prepared without the benefit of a transcript.

Supervisor Special Agent Glen Haas, and ISP Lieutenant David Beasley.

Defendant called one witness: Chris Bowman, a video analyst.

Additionally, after Defendant discussed with his attorneys the possible uses

of any testimony he might give, Defendant testified on his own behalf.

Defendant indicated that he speaks English fairly well, but occasionally

needs help with certain words.  Thus, throughout the hearing, Defendant

was assisted by an interpreter who translated others' statements from

English to Spanish, and the Defendant's testimony from Spanish to

English.

Trooper Miller was the officer who conducted Defendant's traffic stop.

He testified that on February 12, 2007, at around 3:40 p.m., he was

assisting another trooper with a traffic stop on the side of I-55, near mile

post 117.  Trooper Miller testified that he was wearing his glasses at the

time, and through the lenses, his vision is 20-20.  From where he was

standing at the side of the road, he observed a red tractor-trailer drive by in

the middle lane and noticed a crack in each of the truck's two windshields.

The truck was not speeding, but Trooper Miller recognized the cracked

windshields as a traffic violation.  He concluded his assist with the other

trooper and then drove his patrol car north to catch up with the truck, which he pulled over around mile post 133.

Trooper Miller testified that he approached the passenger side of Defendant's truck. Defendant was in the driver's seat, and he also observed a woman passenger in the truck. Trooper Miller told Defendant he stopped Defendant because he observed cracks in the windshield. He also told Defendant he intended to conduct a commercial motor vehicle safety inspection.

Trooper Miller was ISP-certified to conduct commercial motor vehicle inspections.[2] Inspectors can be certified at four levels. The lowest level of certification is Level IV, and the highest is Level I. Level III and Level II are relevant here. A Level III inspection, according to Trooper Miller, covers a driver and his log books. A Level II inspection covers portions of the truck. Trooper Miller testified that at the time of this stop, he believed he was Level II certified. He has since learned that he may have needed re-certification at the Level II level, but that regardless, he was Level III

---

[2] ISP Lieutenant David Beasley is in charge of commercial vehicle safety directives for the ISP. He testified that ISP certifications for motor carrier safety inspections apply only to federal hireback programs, or programs in which the federal government funds the work of state officers. If an ISP officer is not properly certified at a particular level, he is ineligible to work in a hireback program; if he is not working in a hireback program, he still may conduct such inspections.

certified.  At Level III, he could conduct Level II inspections, but he could
not take a truck out of service without the authorization of a Level I
inspector.  However, he could order a driver out of service as a Level III
inspector.  Trooper Miller testified that when he first stopped Defendant's
truck, he planned to conduct a Level II inspection focusing on the truck.  As
the stop transpired, he changed his mind and focused on Defendant for a
Level III inspection.

When Trooper Miller told Defendant about the windshield violation
and his plans for a motor vehicle safety check, Defendant explained that
the truck did not belong to him, and this was his first drive for the company
that owned it.  Trooper Miller testified that Defendant said he was headed
to Chicago from Texas.  He asked for Defendant's license, log book, and
bills.  According to Trooper Miller, when Defendant handed them over, his
hands were shaking slightly.  Trooper Miller suspected Defendant was
nervous.  Trooper Miller testified that Defendant volunteered consent to a
search of the "truck."

Trooper Miller chose not to search the truck at this point, however.
He and Defendant walked back to his patrol car.  Along on the way,
Trooper Miller noted the seal number on the back of Defendant's truck

trailer.  When they got back to the car, Trooper Miller began to review

Defendant's paperwork.  He found that the seal number matched the

number listed in the paperwork, but when he told Defendant he might need

to open the trailer, Defendant denied having a key to the padlock.  Trooper

Miller told Defendant he thought that was odd because Defendant would

need the key to open and unload the trailer once he reached his

destination.

Trooper Miller testified that his review of Defendant's paperwork

revealed several other inconsistencies.  First, the paperwork stated that

Defendant's destination was Kenosha, Wisconsin, not Chicago.  Second,

some of the paperwork indicated a destination date of December 30, 1999.

Third, some of the paperwork stated that Defendant was off duty on

February 9, 2007 but that he received five separate wires of $200 in cash

that day.  Defendant told Trooper Miller he needed that cash to repair his

truck after a breakdown.  Yet, other portions of the paperwork indicated

that Defendant began his trip in Texas on February 9, 2007 and did not

break down until February 10, 2007.  Finally, Defendant provided Trooper

Miller with some documentation related to the repair work, but it reflected

payments totaling much less than $1,000.  Trooper Miller testified that

Defendant's records made him suspicious of Defendant.  The Court admitted copies of Defendant's paperwork as Government Exhibits 7A, B, C, D, and E.  The paperwork supports Trooper Miller's testimony.

While in his patrol car, Trooper Miller also ran a criminal background check on Defendant.  He learned that Defendant had an extensive record, including charges for drug trafficking, involuntary homicide, aggravated assault, and attempt to commit capital murder on a police officer.  Trooper Miller asked Defendant whether he ever trafficked in marijuana, and Defendant admitted to a prior trafficking of 30 pounds.  At this point, Trooper Miller saw from a vein in Defendant's neck that Defendant's pulse increased.  Trooper Miller testified that Defendant also grew fidgety and became overly talkative.  Trooper Miller asked Defendant if he had any weapons in the truck, and Defendant looked him in the eyes and said "no." Trooper Miller then asked whether Defendant had any marijuana, and Defendant again said "no," but this time while looking off toward the horizon.  Trooper Miller then asked whether Defendant had cocaine or methamphetamine.  Defendant brought his eyes back to Trooper Miller's and again said "no."

Trooper Miller then asked whether he could search Defendant's truck and trailer.  Trooper Miller testified that he always distinguishes between the truck — or the cab — and the trailer when asking for consent to search. According to Trooper Miller, Defendant answered, "yes."

While he believed he already had authority to search both the cab and the trailer, Trooper Miller testified that Defendant's nervousness and criminal history made officer safety a particular concern.  Before he began the search, he wanted backup.  He testified that he called in a request for backup and specifically asked for either Officer Maro or Officer Bard. Officer Maro is a canine officer, and he and Trooper Miller usually work together.  Officer Bard is not a canine officer.

Eventually, Officer Maro arrived with his dog, Vik.  Trooper Miller told Officer Maro that he had consent to search the truck, but he asked him to do a canine walk-around with Vik anyway.  Trooper Miller testified that given the option, he always prefers to have a canine alert before conducting a search.  Officer Maro then took Vik around the truck, and he informed Trooper Miller that Vik alerted.  The two did not tell Defendant of the alert.  Trooper Miller testified that at this point, he believed he had at least two bases for a search:  Defendant's consent and a positive dog alert.

He also believed that per a Level II motor vehicle safety inspection, he could open the truck to inspect the cargo, but he did not plan to conduct a search on that basis.

Trooper Miller then asked Defendant to get out of the patrol car and open the trailer of the truck.  Defendant produced keys for the trailer and unlocked the padlock.  Trooper Miller then got into the trailer.  He found boxes of avocados arranged in rows throughout the trailer.  Between the rows, stacked almost to the ceiling, were bales of marijuana wrapped in silver tape.  After returning Vik to his car, Officer Maro also searched the trailer.  He discovered cocaine in a box toward the front of the trailer.

After finding the drugs, Trooper Miller ordered Officer Maro to place Defendant under arrest.  Trooper Miller escorted the woman in the truck. Trooper Miller then advised Defendant of his Miranda rights by reading them from a card.  He looked at his watch when he read the rights and recorded the time as 4:12 p.m. Defendant stated that he understood his rights and would cooperate.

Trooper Miller testified that after the discovery of the drugs and Defendant's arrest, he realized that the video camera in his patrol car was not functioning.  The camera should have switched on when Trooper Miller

turned on his police lights, but it often did not.  He had reported the faulty

camera before.  From inside the car, he could tell whether the camera was

on, but he testified that he did not think to check it when this traffic stop

began.  On previous occasions, Trooper Miller had discovered that pulling

a fuse under the hood of the car usually flipped the camera back on.  He

usually turned the camera off at the end of each traffic stop by pushing a

"stop" button inside the car.  According to Trooper Miller, after the camera

reactivated, it would run a series of tests before beginning to record.

These tests typically took only a couple of minutes.  Trooper Miller testified

that at this stop, once he realized the camera was not working, it took him

only four to six minutes to pull the fuse to trigger the camera.

　　　The Court admitted the video taken at the stop as Government

Exhibit 5.  This video tape includes footage of many incidents in addition to

Defendant's traffic stop.  The footage immediately preceding Defendant's

traffic stop ends when a superimposed date and time stamp states

"2/12/07" and "16:48:42."  The footage of Defendant's traffic stop begins at

"2/12/07" and "18:08:44."  The second set of digits theoretically represent

the time, in military time, but Trooper Miller testified that he does not know

how to change the time display, and the time is usually wrong on his

videos.  For example, he said, the time 18:08:44 here should represent 6:08 p.m., but in February in Central Illinois, it would be dark at that time, and in the video here, it is clearly still light outside.

When the tape of this traffic stop begins, the back of a closed truck trailer is depicted.  It is parked on the right shoulder of a highway, and there is snow on the ground.  While no people are immediately visible, there are also recorded voices on the tape.  To start, they discuss why a woman was handcuffed.  Then, one of the men denies that there is cocaine in the truck, and a second insists that "we" found cocaine.  The second voice orders a third person to go get the cocaine to prove that it exists.  The tape then shows two police officers open the trailer; inside the trailer, a wall of boxes stacked almost to the ceiling is visible.  One of the men climbs into the trailer.  While the two men are shown getting the cocaine, the second voice asks the first voice to confirm that he granted consent to search the truck and that the dog "hit on it."  The first does confirm the requests.  The man who climbed into the truck then climbs down with something in his hand. He disappears off screen.  The second voice then asks the first voice whether he believes they have talked to him straight, and the first concedes that they have.  The second person then asks the first why he was so quick

to grant consent to search, and the first concedes that he did so hoping it would convince the second not to do so or not to search.  The two then discuss the cocaine, and the second voice says that the first person got cheated because his people snuck cocaine onto the truck while paying him only for transporting marijuana.  Trooper Miller testified that the first voice on the video is Defendant's, and the second is his own.

Trooper Miller testified that in addition to arresting Defendant for the drugs, he took Defendant out of service for commercial driving because of the false log book.  Even with only a Level III certification, he had authority to do so according to his testimony.  He issued his motor carrier safety action on a "Stop Card and Written Warning" form, admitted as Government Exhibit 2.  Defendant's signature is not on this form.  Trooper Miller testified that by the time he had completed the form, Defendant was in custody.  Because Trooper Miller was not with Defendant, he simply made sure Defendant got a copy of the form to keep.

Officer Maro also testified for the Government.  He stated that on February 12, 2007, he was assigned to the Patrol Division and worked with a canine named Vik.  He and Vik had received extensive training from the ISP.  Initially, they participated in a 10-week course during which they

learned narcotics detection, tracking, and aggression techniques.
Every six months following this course, they went through retraining and
re-certification.  Their certification was current on February 12, 2007.  The
Court admitted Government Exhibit 8, an evaluation form reflecting Officer
Maro's and Vik's December 1, 2006 re-certification.

Officer Maro testified that on February 12, 2007, he and Vik were on
duty around 3:40 p.m. when he received a call to assist Trooper Miller at a
traffic stop.  At the time, he was assisting at the same traffic stop that
Trooper Miller had recently left.  He testified that he understood he was
requested specifically to perform a canine free-air sniff search.

Officer Maro arrived at Defendant's traffic stop around 4:00 p.m.
Trooper Miller told him that he had consent to search Defendant's truck,
but wanted a canine free-air search as well.  Officer Maro did not think it
was odd that Trooper Miller wanted a sniff search even with consent.

Officer Maro placed Vik on a leash and led him to the front of the cab
portion of the truck.  He ordered Vik to "seek, find dope."  They walked
around the truck, and at the left front corner of the trailer section, Vik
alerted.  Officer Maro testified that Vik is a passive-alert dog, which means
she signals a drug find by displaying a breathing and posture change and

then sitting.  She performed this alert on Defendant's truck.  Officer Maro
then placed Vik back in his car and told Trooper Miller that she had alerted.
He testified that Vik never entered the trailer.

Office Maro and Trooper Miller then had Defendant open the back of
the trailer.  To break the seal, Defendant used Trooper Miller's flashlight.
Officer Maro and Trooper Miller proceeded to search the trailer.  In the
trailer, Officer Maro found boxes of avocados, foil bales of marijuana, and
an air purifier box containing cocaine.

After Defendant was arrested, Trooper Miller drove him to nearby
Stine Seed.  Defendant's truck was brought there as well.  Officer Hansen
responded to a call for assistance and met them at Stine Seed.  He first
spoke with Trooper Miller and then examined the truck and cargo.  He then
approached Defendant, advised him of his rights, and at 5:49 p.m., had
Defendant complete a form confirming that he understood his Miranda
rights.  The Court admitted this form as Government Exhibit 6.  Officer
Hansen testified that he knew Trooper Miller had already read Defendant
his Miranda rights, but he performed the second process to get an
unequivocal record of a waiver of rights.

Officer Hansen then spoke with Defendant about his drug suppliers. Defendant agreed to help police intercept his supplier by meeting him with the truck in Chicago as planned. Officer Hansen testified that throughout his conversation with Defendant, he never coerced or threatened Defendant.

DEA Agent Haas also met the group at Stine Seed. Agent Haas testified that he responded to a request for assistance with a drug interdiction. When he arrived, the other officers informed him of previous events. He learned that Officer Hansen had interviewed Defendant already and that Defendant had agreed to cooperate by meeting his supplier in Chicago. He also observed that the windshields of Defendant's truck were cracked. Agent Haas then drove with Defendant and another law enforcement officer to Chicago. Defendant met with his supplier, but the officers lost surveillance and were unable to apprehend the supplier.[3] Agent Haas testified that he never coerced Defendant to obtain his cooperation.

---

[3]  The parties elicited a substantial amount of testimony regarding this unsuccessful trip to Chicago, but as the Court finds it irrelevant for this Motion, it does not recount those facts here.

Agent Haas also testified regarding the forfeiture of the truck Defendant was driving.  He stated that in his 22-year career, he has never seized the vehicle involved in a traffic stop for evidence; vehicles are seized for forfeiture proceedings.  Here, the DEA seized Defendant's truck for forfeiture.  Agent Haas testified that he saw no evidentiary value in the truck.  Per the agency's procedure for seizures, the truck received an evidence number.  That fact did not indicate that the truck was seized as evidence.

After the initial seizure, DEA Headquarters sent out a notification of seizure and forfeiture to Defendant's attorney and the owner of the truck.  The notification informs recipients of the requirements for contesting a forfeiture.  Here, Defendant's attorney acknowledged receipt of the notification.  The Court admitted the forfeiture paperwork as Government Exhibit 9, which includes this receipt acknowledgment.  No one contested the forfeiture, so the DEA disposed of the truck.

Defendant also testified at this hearing.  The Court gave the Defendant certain warnings about the use of his testimony at trial, prosecution for perjury, and obstruction of justice enhancement.  According to Defendant, many of the Government's witnesses lied to the Court.

Defendant testified that on February 12, 2007, when he passed mile marker 117 on I-55, he did not see a traffic stop on the side of the road. Not long after that point, however, he noticed a police car driving behind him and sometimes pulling up alongside. This car followed him for about 12-14 miles, but was never in a position to observe his windshields. Defendant testified that he does not remember any cracks in his windshields. Eventually, the police officer turned on his lights and pulled Defendant over.

Defendant testified that once they pulled over, the police officer — Trooper Miller — walked up along the passenger side of his truck. At the front of the truck, Trooper Miller got out a pad of paper and wrote down Defendant's license plate number. He looked up at the truck cab and kept writing. Trooper Miller then walked back to his patrol car without speaking to Defendant. After about five minutes, he returned to Defendant's truck.

Trooper Miller then opened the passenger side door and asked Defendant for his driver's license and paperwork. Defendant handed them over and got out of the truck. Trooper Miller asked Defendant what he was transporting, and Defendant told him avocados. Trooper Miller then asked

how much cocaine Defendant was carrying, and Defendant denied having any cocaine.

Trooper Miller had Defendant then walk back to his patrol car. Defendant sat in the passenger seat, and Trooper Miller closed the door. Trooper Miller then got into the driver's seat and again asked about drugs. Defendant denied having any drugs, and Trooper Miller asked where he was heading. Defendant told Trooper Miller he was driving to Kenosha, Wisconsin. Trooper Miller asked if he had been arrested before, and Defendant said that he had. According to Defendant, Trooper Miller then asked for consent to search the truck. Defendant never volunteered consent, but after Trooper Miller asked for it, he granted consent to search the cab of the truck; he told Trooper Miller that he did not have authority to consent to a search of the trailer. Defendant told Trooper Miller that he would have to ask the truck owner for consent to search the trailer.

Defendant testified that at this point, about 15 minutes into the traffic stop, he asked Trooper Miller why he had been stopped. Trooper Miller told Defendant that his windshields were cracked. Trooper Miller also asked about emergency triangles on the truck, but he never indicated that Defendant had been stopped for a motor vehicle safety inspection.

Defendant testified that he never granted consent to search the trailer of the truck, but at some point, Officer Maro arrived with his dog.  From inside the police car, Defendant observed Officer Maro get the dog out of his vehicle, prepare him, and then walk up to the back of the trailer.  Officer Maro then opened the inspection door in the trailer and hit his leg, motioning for the dog to jump up.  The dog did, and climbed into the trailer through the inspection door.  After the dog climbed down, Officer Maro closed the inspection door, and the two walked around the truck.  Defendant never saw the dog sit or alert in any way, but he could not see the dog when they walked around the front of the truck.  The police never informed him that the dog alerted.

After Officer Maro put the dog back in his vehicle, Trooper Miller and Officer Maro had a conversation while standing on the side of the road.  Defendant could not hear what they said.  Then, Trooper Miller opened the door to the patrol car and told Defendant to get out.  He asked Defendant for the keys to the trailer, and Defendant said that he did not have the keys.  Defendant was simply surprised by the question.  When Trooper Miller pointed out that he must have the keys because he would need them to open and unload the trailer when he reached his destination, Defendant

realized he did have the keys.  He retrieved them from the cab of the truck and gave them to Trooper Miller.  Defendant did not believe he had the option to withhold the keys.  He did not consider turning over the keys to be granting consent to a search of the trailer.  Defendant knew the trailer contained marijuana and knew that a search would create problems for him; he testified that he would not willingly have allowed a search.

Defendant also testified about the tape of his traffic stop.  He stated that the video does not accurately depict the stop.  According to Defendant, it was snowing lightly when he was stopped, but the ground is not wet in the video.  Additionally, because of the snow, his truck was dirty that day, and in the video, his truck is not dirty.  Defendant also testified that none of the voices in the video are his.  He does not remember having the conversations that are recorded in the video, and he is sure that the first voice is <u>not</u> his.  Defendant believes that the police falsified the video.

Defendant called Chris Bowman, a technician at Beatty Televisual, to testify regarding his analysis of the video tape.  Bowman has been with Beatty Televisual since 1995, and he has extensive experience in electronic editing.  He viewed the original VHS tape of the traffic stop at the

request of Defendant and the Government.  He focused on whether the tape contained any editing.

According to Bowman, at the point immediately before the section recording the traffic stop at issue, between the section ending at 16:48:52 and the section starting at 18:08:44, there is a "jerk" in the tape.  For a 3- to 5-second period, the tape is scrambled.  Bowman found no evidence of editing on the tape, however.  That 3- to 5-second section is "questionable," but he could not detect any editing, even in that section. Bowman stated that the tape does contain a superimposed image, but he could not say what the image was and acknowledged that it is possible that the superimposed image is simply a camera-generated date and time stamp.

## II.  ANALYSIS AND CONCLUSIONS OF LAW

The issues before the Court are driven essentially by the issue of credibility.  As explained below, the Court finds Defendant's testimony untruthful and beyond belief.  Based on that determination and an analysis of applicable law, there is no legal  basis to suppress the evidence recovered from the traffic stop or Defendant's statements or to dismiss the Indictment.

A.     MOTION TO SUPPRESS

    1.     EVIDENCE

The Fourth Amendment to the Constitution guarantees the "right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.  A defendant seeking to suppress evidence because of a violation of the Fourth Amendment first must establish that he has standing to challenge the search or seizure.  United States v. Sweeney, 688 F.2d 1131, 1143 (7th Cir. 1982).  Once the defendant has established standing in a case in which law enforcement officers conducted a warrantless search, the burden of proof shifts to the government, because warrantless searches are "per se unreasonable under the Fourth Amendment — subject only to a few specifically established and well-delineated exceptions."  Katz v. United States, 389 U.S. 347, 357 (1967).  At that point, the Government bears the burden of establishing by a preponderance of the evidence that an exception to the warrant requirement applies.  United States v. Basinski, 226 F.3d 829, 833 (7th Cir. 2000).

 On the record at the evidentiary hearing in the instant case, the Government conceded its belief that Defendant has standing to challenge

the search at issue.  This Court also believes, based on the evidence

presented, that Defendant has Fourth Amendment standing.  Thus, the

burden shifts to the Government to establish, by a preponderance of the

evidence, that an exception to the warrant requirement applies.  The

Government established two facts here — Defendant's consent and the

dog alert — that supported exceptions to the warrant requirement.

Before discussing those facts, however, the Court finds that the traffic

stop that preceded the search here was reasonable.  The decision to stop

an automobile is reasonable when the police have probable cause to

believe that a traffic violation has occurred.  Whren v. United States, 517

U.S. 806, 810 (1996).  Probable cause exists when "the circumstances

confronting a police officer support the reasonable belief that a driver has

committed even a minor traffic offense."  United States v. Cashman, 216

F.3d 582, 586 (7th Cir. 2000). Driving with a defective windshield is a traffic

violation.  See 625 ILCS 5/12-503(e); 49 C.F.R. § 393.60(c).  Trooper Miller

testified that he stopped Defendant after he observed cracks in the

windshields of Defendant's truck.  The evidence supports a finding that

Trooper Miller did in fact observe cracks in Defendant's windshields.  Both

Trooper Miller and Agent Haas testified that they saw cracks in the

windshields that day.  Defendant testified only that he did not remember any cracks.  The Court admitted four photographs of the windshields as Government Exhibits 1A, B, C, and D.  The lighting in the photographs makes it difficult to observe the cracks visible in any of the first three, but a crack is clearly visible in Government Exhibit 1D.  Thus, Trooper Miller had probable cause to stop Defendant for a traffic violation.

Defendant contends that Trooper Miller did not really stop him because of the cracked windshields.  According to Defendant, Trooper Miller was never in a position to observe the cracked windshields before he pulled Defendant over.  Moreover, even if the windshields were cracked, Trooper Miller was not authorized to conduct motor vehicle safety inspections, so it is not reasonable to conclude that he would have stopped a driver just for such an issue.  Instead, Trooper Miller must have stopped Defendant because he is Mexican / Hispanic.

First, the Court notes that Defendant has produced no evidence that Trooper Miller pulled Defendant over because he is Mexican / Hispanic.

Second, the Court finds that Trooper Miller was authorized to conduct motor vehicle safety inspections.  Under the federal hireback program rules, he may not have been Level II re-certified, and so could not have put

Defendant's truck out of service without approval if he was working in a

federally funded program, but he still could have conducted the inspection.

Moreover, Trooper Miller apparently thought he was Level II certified, so it

is not unreasonable to conclude that he would have stopped a driver for

such an issue.

Third, Defendant is confusing the rules governing officers' authority to

cite drivers for traffic violations and their authority to conduct commercial

motor vehicle safety inspections.  Cracked windshields are Illinois traffic

violations.  Whether an officer intends to conduct a commercial motor

vehicle safety inspection has no effect on whether he can stop and cite a

driver for driving with a cracked windshield

Finally, and most importantly, all evidence of pretext is irrelevant.

Under Whren, 517 U.S. at 814, "the actual motivations of the individual

officers involved" do not matter.  "Subjective intentions play no role in

ordinary, probable-cause Fourth Amendment analysis."  Id.       The record

supports the conclusion that Trooper Miller had probable cause to believe

that Defendant's windshields were cracked at the time he initiated the

traffic stop.  Whether he really stopped Defendant because of that traffic offense does not matter.[4]

Finding that the initial traffic stop was reasonable, the next issue is whether the search was also constitutional.  "It is . . . well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent."  Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973).  Any person with common authority over the property may consent to a search.  United States v. Booker, 981 F.2d 289, 294 (7th Cir. 1992).  An officer's "reasonable belief that the person consenting to the search had authority to do so is all that is necessary for a consent search to be valid."  United States v. Jensen, 169 F.3d 1044, 1049 (7th Cir. 1999).

The cumulative evidence shows that Defendant granted consent to a search of the trailer.  Trooper Miller testified that Defendant twice consented to a search.  The video tape also records a voice, identified by Trooper Miller to be Defendant's voice, agreeing that he had consented to a search.  Defendant denies that he granted consent and alleges that the

---

[4]  Because Defendant's contentions of pretext are irrelevant, the Court sees no reason to discuss Defendant's cross-examination of Trooper Miller regarding Operation Valkyrie, an old ISP drug interdiction program.

tape is fabricated.  However, the Court finds the Defendant's testimony
lacks credibility.  Defendant has made the common mistake of simply
denying too much.   The Court simply finds it unbelievable that after the
traffic stop, at least three officers would have taken Defendant's truck back
out to the side of I-55, filled it with cargo, faked a conversation, reenacted
the retrieval of cocaine from the truck, and then spliced the footage back
into the tape recorded by Trooper Miller's patrol car camera.  Even
Defendant's electronic editing expert could find evidence only of a 3- to 5-
second oddity in the tape.  The Court believes that the tape is authentic,
and that Defendant's voice can be heard conceding a grant of consent.
Based on the tape and Trooper Miller's testimony, the Court finds that
Defendant granted consent to a search of the trailer.  That alone made the
search reasonable.

In addition to consent, however, the officers also had probable cause
to search.  The automobile exception allows for a warrantless search of a
vehicle when officers have probable cause to believe that the vehicle
contains contraband or evidence of a crime.  See Carroll v. United States,
267 U.S. 132, 153-56 (1925).  Probable cause exists if, given the totality of
the circumstances, "there is a fair probability that contraband or evidence of

a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213,

238 (1983). Once a trained dog has alerted on a vehicle, officers have

probable cause to believe that the vehicle contains contraband. See

United States v. Ganser, 315 F.3d 839, 844 (7th Cir. 2003).

Here, the evidence establishes that a trained dog did alert on

Defendant's trailer. Based on Officer Maro's testimony and the records of

Vik's most recent re-certification, it is clear that Vik was trained in narcotics

detection. Officer Maro and Trooper Miller both testified that Vik alerted on

the front left corner of the trailer. While Defendant denied seeing the dog

alert, he conceded that he could not see the dog when it was at the left

front corner of the trailer. Thus, the Court finds that Vik did in fact alert.

Vik's alert provided probable cause to search the trailer. Because the

search of the trailer was reasonable, Defendant's request to suppress the

evidence found inside should be denied on this alternative ground as well.

2.    STATEMENTS

Defendant also has moved for the suppression of the statements he

made during and after the traffic stop. The Fifth Amendment protects an

individual from being "compelled in any criminal case to be a witness

against himself." U.S. Const. amend. V. In Miranda v. Arizona, 384 U.S.

436, 467 (1966), the Supreme Court recognized that "in-custody interrogation" places "inherently compelling pressures" on persons interrogated.  Thus, to safeguard the Fifth Amendment privilege against self-incrimination, under Miranda, "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of a defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination."  Id. at 444.  A defendant may waive his Fifth Amendment rights as articulated in Miranda "provided the waiver is made voluntarily, knowingly, and intelligently."  Id.

Trooper Miller first read Defendant his Miranda rights just after the discovery of the drugs and Defendant's arrest.  Thus, the first issue for the Court is whether Defendant's preceding statements were obtained in violation of Miranda.  For Miranda to apply to a traffic stop, "a defendant must be subject to a restraint on his freedom of the degree associated with a formal arrest."  United States v. Murray, 89 F.3d 459, 461 (7th Cir. 1996) (internal quotation marks omitted).  Here, there is no evidence in the record to show that Defendant's freedom of movement was restrained prior to his Miranda warnings in a manner equivalent to that associated with a formal

arrest.  Defendant was questioned on the side of a busy highway, in broad
daylight, for only about half an hour.  There are no indications that the
police overcame his will.  The fact that he was questioned in a patrol car is
not enough to place him "in custody" for purposes of <u>Miranda</u> warnings.  <u>Id.</u>
at 462.   A reasonable person in Defendant's position would not have
considered the brief questioning at the traffic stop prior to his arrest to be a
custodial interrogation.  Thus, his pre-<u>Miranda</u> warning statements were
not compelled self-incrimination.

Once Officer Maro arrested Defendant, however, Defendant was in
custody.  Whether Defendant then voluntarily, knowingly, and intelligently
waived his <u>Miranda</u> rights is a fact-dependant inquiry.  Factors relevant to
the inquiry "include, but are not limited to, whether the defendant received
<u>Miranda</u> warnings; the defendant's age, intelligence level, education, and
mental state; the conditions under which the defendant was interrogated
(i.e., duration, environment, and access to restroom facilities and food);
and whether the defendant was physically punished." <u>United States v.</u>
<u>Murdock</u>, 491 F.3d 694, 699 (7th Cir. 2007).

Here, the facts establish a proper waiver. There is no dispute that
Defendant received <u>Miranda</u> warnings:  Trooper Miller read them

immediately following Defendant's arrest, and, at Stine Seed, Officer

Hansen had Defendant sign a written Miranda waiver.  There is no

evidence that Defendant lacked the maturity, intelligence, or education to

understand his rights.  Indeed, he is an adult who speaks two languages

and has been through the criminal justice system previously.  Further, while

there is evidence that Defendant was nervous, from the video tape it is

clear that he was not afraid to contradict police officers.  He repeatedly

denied transporting cocaine until he saw the cocaine because he had not

realized his suppliers had included it in the truck.  Thus, there is no

evidence that his mental state prevented him from waiving his rights

voluntarily.  Finally, there is no evidence that the conditions of his

confinement were oppressive or that the officers physically punished him.

Defendant voluntarily, knowingly, and intelligently waived his Miranda

rights.   There is no basis for a suppression of his statements.

B.     MOTION TO DISMISS THE INDICTMENT

        Defendant also has asked the Court to dismiss the Indictment for

"outrageous government behavior."  Omnibus Pretrial Motions, at 21.  A

court may dismiss an Indictment where government conduct is "so

outrageous that due process principles would absolutely bar the

government from invoking judicial processes to obtain a conviction."

United States v. Russell, 411 U.S. 423, 431-32 (1973).  Defendant

contends that law enforcement officers lied about the stop, coerced

Defendant to consent to a search of the truck, fabricated the video tape

and failed to maintain its chain of custody, disposed of the truck to prevent

inspection of the windshields, falsified their reports, and engaged in

profiling.  As stated above, the Defendant either failed to present evidence

of these allegations, or the Court has found Defendant's testimony to lack

credibility and to be beyond belief.  Thus, the Court finds no basis for

dismissing the Indictment and so recommends.

## III. CONCLUSION

For all the above reasons, I recommend that Defendant's Omnibus

Pretrial Motions (d/e 59) be DENIED.

The parties are advised that any objection to this Report and

Recommendation must be filed in writing with the Clerk of the Court within

ten working days after being served with a copy of this Report and

Recommendation.  See 28 U.S.C. § 636(b)(1).   Failure to file a timely

objection will constitute a waiver of objections on appeal.  See Video

Views, Inc. v. Studio 21, Ltd., 797 F.2d 538, 539 (7th Cir. 1986); Local

Rule 72.2.

ENTER:     February 2, 2009

                                        *s/ Byron G. Cudmore*
                         _____
                                  BYRON G. CUDMORE
                         UNITED STATES MAGISTRATE JUDGE